NEW ORLEANS GAS LIGHT AND BANKING COMPANY *v.* WEBB.

---

## LABOURDETTE *v.* THE FIRST MUNICIPALITY OF NEW ORLEANS.

Where, on counting the votes put into the ballot-box in an election for an officer by a municipal council, it appears that thirteen votes were put in, when the members present were only entitled to give twelve votes, and that seven were in favor of plaintiff and six for another person, there is no election.

APPEAL from the Second District Court of New Orleans, *Canon,* J. On the 11th day of May, 1846, the Council of Municipality No. 1 balloted for a wharfinger. On opening the ballot-box and counting the votes, it appeared that there were: for *Labourdette,* 7 votes; for *Dupaty,* 6 votes. Where-

LABOURDETTE upon *Labourdette* was proclaimed duly elected wharfinger of the Municipality
v.
FIRST No. 1. On the 25th of the same month, the sureties offered by *Labourdette*
MUNICIPALITY. were approved by the Council: and on the 4th of June he executed his official
bond, which was accepted by the mayor of the city. *Labourdette* then entered
upon the discharge of the duties of wharfinger. *Dupaty* protested against the election of *Labourdette*. On the 8th of June, 1846, the Council adopted a resolution, in which they declared the protest of *Dupaty* well founded. They accordingly pronounced the election of *Labourdette* null and void, and resolved to proceed at their next meeting to the election of a wharfinger for the municipality. The resolution was in the following words: "*Résolu* que le Conseil reconnait que le protêt de Mr. *Texin Dupaty* contre la nomination de Mr. *Labourdette* est fondé; que la dite nomination est nulle et non avenue; et que le Conseil procédera, lundi prochain, à l'élection d'un wharfinger pour cette municipalité." On the 15th of June, the day of the next meeting, the Council elected *Dupaty* to the office of wharfinger of the municipality.

At the expiration of the month of June, *Labourdette* applied to the municipal treasurer for the payment of a month's salary. He was answered that there was no salary due him, as he was not the wharfinger of the municipality. On the 2d of July, he wrote to the Council offering to continue to discharge the duties of wharfinger. At the same time he demanded payment of a month's salary as wharfinger, and stated that if the Council failed to comply with his demand, he would claim a whole year's salary. The Council refused to recognise *Labourdette* as wharfinger of the municipality; but they adopted a resolution, in which they offered to pay him three hundred dollars for his services as acting wharfinger prior to the election of *Dupaty*. This offer was rejected by *Labourdette*, and the resolution was repealed. On the 28th of July, 1846, *Labourdette* instituted the present suit, to recover from the municipality one thousand dollars, a year's salary, upon the grounds, that the ordinances creating the office of wharfinger and fixing the salary attached thereto, made the office annual, with a yearly salary; that he was legally and duly elected wharfinger, in May, 1846; and that he had been dismissed from office, without any cause or complaint.

The defendants, in their answer, pleaded a general denial, and alleged that the plaintiff had no just cause of action, that they owed him nothing, and that in electing *Dupaty* wharfinger they had duly and justly exercised the powers conferred upon them by law. The plaintiff offered in evidence the minutes of the proceedings of the Council of the First Municipality; the bond executed by plaintiff; and a letter from the latter demanding the payment of his salary as wharfinger for the first month, and expressing his readiness to continue to discharge the duties of the office. The record also contains a bill of exceptions, taken by the defendants to the rejection of the evidence of *Genois*, the recorder of the First Municipality, offered to establish the fact that he had voted in the election of *Labourdette*. This evidence was objected to, on the grounds: 1st, that the facts attempted to be proved were not alleged in the pleadings; 2d, that parol proof was inadmissible to establish the proceedings of the Council; and 3d, that no parol evidence could be offered by defendants, to contradict their own official records. The evidence was rejected.

There was judgment below for the plaintiff, for $1000, a year's salary as wharfinger, with interest from judicial demand. The defendants appealed.

*Benjamin* and *Micou*, for the plaintiff.   The facts of this cause are simple and uncontested.   The plaintiff was employed, for a year, at a fixed salary, and was discharged without any fault or complaint urged against him, about one month afterwards.   He claims his year's salary, under the well known legislation and jurisprudence of this State.   He relies on art. 2720 of the Civil Code.   *Orphan Asylum* v. *Mississippi Insurance Company*, 8 La. 181.   *Sherburne* v. *Orleans Cotton Press*, 15 La. 360.

*R. Hunt*, for the appellants.   1. The first question which arises in this case is, was *Labourdette* duly and legally elected wharfinger of Municipality No. 1, on the 11th day of May, 1846?   I contend that he was not.   The 8th section of the act of March, 1836, amending the acts incorporating the city of New Orleans, vested "the exclusive right in the councils of each of the municipalities, to appoint all officers thereof."   Bul. & Cur. Dig. 124.   The 10th section of the act of March, 1840, still further amending the charter of the city, provided, that "thereafter the council of Municipality No. 1, should be composed of twelve members only."   Bul. & Cur. Dig. 132.

On the 11th of May, 1846, all the members composing the council of the Municipality No. 1, met, and all voted at the election for a wharfinger.   It required a majority to elect.   The *lex majoris partis* is the law of all public councils, elections, &c., where there is no express provision to the contrary.   The majority, here, means the major part of those who are present at a regular corporate meeting.   Bacon's Abr. Title Corporation E. no. 7, of the concurrence required in corporate acts.   2 Kent's Commentaries, 293.   1 Kyd on Corp. 308, 400, 424.   Jef. Man. s. 41.   Now, the plaintiff has shown by the journals of the council, that there were six votes against him at the balloting on the 11th of May.   It follows that there was not a majority of the twelve in his favor.   'i here was therefore no election of a wharfinger.   It it true that on counting the ballots, seven votes were found in the ballot box in favor of *Labourdette*.   But these, added to the six against him, made thirteen votes ; thirteen votes given by a "council composed of twelve members only," each of whom had a right to one vote only !   The thirteenth vote was clearly an illegal vote, and avoided the election.   2 Kyd on Corp. 7, 8.

The judge *a quo* says, that the recorder of the municipality voted for the wharfinger; and that he "voted in the election of all officers, because the 18th article of the supplemental regulations of the council, especially gives him the right to vote in all elections."   This court has solemnly decided in the case of the recorder of the Municipality No. 2, that the recorder is not a member of the council, and that he has no right, under the charter of the city, to vote, except in committee of the whole, or in giving a casting vote.   Sec. 5, act of 1805, Bul. & Cur. Dig. 93.   *Reynolds* v. *Baldwin*, 1 An. R. 162.   It is not pretended that, at the election of a wharfinger on the 11th of May, 1846, the council resolved itself into a committe of the whole, nor that there was a tie in the votes, and that the recorder gave the casting vote.   The evidence clearly establishes that the thirteen votes were deposited in the ballot box and counted out, without any reference to a tie or a casting vote.   If then the recorder voted, he voted illegally.

It is well settled, that a presiding or chief officer of a corporation has no powers except those which the charter confers upon him.   To enlarge or restrict those powers would be to change the charter.   He cannot be vested with a right to vote by a by-law, where the charter does not confer the right.   This was the point decided in the case of *The King* v. *J. Ginever*, 6 Durnford & East's Rep. 732–735 ; and it is sustained by the reasoning of the court in *The King* v. *Bird*, 13 East's Rep. 384 ; and in all the later cases.   The effect of such a by-law, it is plain, would be to constitute a different mode of election from that pointed out by the charter.   It is the right of the legislature to erect corporations and prescribe their constitutions.   If corporations take upon them to vary their constitutions or charters, they act from that moment without authority.   The by-law, referred to and relied on by the judge in this case, is not a mere regulation of the time and mode of election, but it creates a right of election contrary to the charter.   The case amounts to this : The charter provides that the election shall be made by "a council composed of twelve members only," or by the majority of them voting by ballot.   Such is the law given by the only power that could give it.   But the council of the Municipality No. 1, not liking that mode of election, or the limited and restricted powers conferred upon the recorder, have chosen to alter and enlarge his powers, and to vest him with the right

to vote as a component part of the council. This is changing and reversing the provisions of the law, and putting the election of officers into different hands from those in which the legislature chose to place it in the first instance. This cannot be tolerated. If the recorder voted, he acted illegally. His vote was informal, unauthorized; a violation of the charter of the city, and an usurpation of power.

But there is not a tittle of evidence to show that the recorder did vote. When the defendants offered to introduce recorder *Genois* as a witness, for the purpose of proving whether he had voted or not, the plaintiff, through his counsel, objected to the introduction of the witness, upon the ground, that what was done in the council can only be proved by the journals of the council: and the court sustained the objection. There is nothing in the record to prove that the recorder voted. "De non existentibus et non apparentibus eadem est ratio," is a maxim of law as well as of philosophy. In the absence of proof to the contrary we must presume that a public officer did not act illegally. The thirteenth vote then, the illegal vote which avoided the election, must be regarded as a duplicate vote, accidentally or fraudulently placed in the ballot-box, by some person other than the recorder. The judge *a quo* says, "the recorder voted without opposition," and thence infers that *Labourdette's* election was valid. To this it is answered : 1st. There is no evidence, as we have just seen, that the recorder did vote. 2d, If the recorder did vote without opposition, the culpable ignorance or negligence of the council in permitting him to do so, cannot render his illegal vote legal. And 3d, Although *Labourdette* was proclaimed duly elected wharfinger on the 11th of May, 1846, yet *Dupaty* protested against the election ; and, at a subsequent meeting, to wit, on the 8th of June, the municipal council sustained the protest, and set aside the election of *Labourdette* ; and, on the 15th of the same month, regularly and duly elected *Dupaty* wharfinger.

But the judge below argues that the council, by approving the sureties and accepting the bond of *Labourdette*, " cured all irregularities, if any had existed," in the election of *Labourdette*, and ratified his election. This is not law. No issuing of commissions, no approval of sureties, no acceptance of bonds, can confer a right to an office, or render an irregular or illegal appointment to office valid. By means of a writ of *mandamus* or of *quo warranto*, an usurper or intruder into an office in a corporation may be ousted; or a person who has a right to hold an office in a corporation may be put in possession of it, although the party illegally in office may have been sworn and admitted into it. C. P. arts. 829, 834, 844, 867, 868 et seq. 6 La. 598. How then can the acceptance of a bond from one claiming to be an officer, affect his appointment ?

In the case of the *United States* v. *Maurice et al.*, Chief Justice *Marshall* decided that the appointment of *Maurice* to be an agent of fortifications, by the Secretary of War, was irregular and void ; but at the same time it was held that the bond given by said *Maurice* for the faithful discharge of the duties of agent of fortifications, though void as a statutory obligation, was valid as a contract with the United States. 2 Brockenbrough's Reports, 108–113. In *Rex* v. *The Corporation of Bedford Level*, the court granted a *mandamus*, upon an affidavit that one of two candidates for a corporate office had obtained a majority, only by means of illegal votes: although the party who had the majority had been sworn and admitted into office. 6 East's Reports, 356. It is clear that the council of the Municipality No. 1 could only appoint to office in the mode prescribed by the legislature of the State, and that mode is by ballot.

The 8th section of the act of September 1, 1812, entitled, " An act to determine the mode of electing the mayor, recorder and other public officers, necessary for the administration of the police of the city of New Orleans, and for other purposes," provided as follows, viz : " The mayor shall nominate, and by and with the consent of the council shall appoint, to all places which now are, or may hereafter be created in virtue of the act of incorporation," &c. Bul. and Curry's Digest, 100. The 6th section of the act of March 14th, 1816, amendatory of the act of September, 1812, provided that, " the council shall name by ballot its clerk and its other private officers, as also the treasurer of the city." Bul. and Curry's Digest, 102. The 2d section of the act of March 8th, 1836, enacted that, "all the powers (now) then vested by law in the City Council of New Orleans should appertain to, be invested in, and be exercised by, the councils of each of the municipalities created by this act, within their respective limits," &c. Bul. and Curry's Digest, 122. And the 8th section of the same act of 1836, further provided, " that the councils of each of said municipalities

shall have the exclusive right to appoint all officers thereof." Bul. and Curry's LABOURDETTE Digest, 124. Applying the sound rule of construction laid down by this court *v.* in relation to the municipal councils of New Orleans, in the case of *Reynolds* v. FIRST MUNICIPALITY. *Baldwin*, we must consider the statutes of 1816 and 1836, statutes *in pari materiâ*, to be construed with a reference to each other. C. C. art. 17. Indeed all acts upon the same subject matter are to be taken together as if they were one law, and should be so construed, that, if it can be prevented, no provision or clause in them shall be void. The acts of 1816 and 1836, therefore, must both stand, so far as they are consistent with each other. Now, the power to elect certain officers, conferred upon the council in 1816, was enlarged and merged in the exclusive "power granted to the councils of each of the municipalities in 1836, to appoint all officers thereof." But the mode of appointment, to wit, by ballot, was left unchanged; that mode of appointment or election being most consistent with the constitution and general laws of the State, and with the habits of the people. It is too clear for argument, that the acceptance of *Labourdette's* bond, and the approval of his sureties, could not do away with the necessity of electing him legally, by ballot, to the office of wharfinger. The law must be observed.

II. But suppose *Labourdette* was duly elected wharfinger, the next point submitted is: That the council of Municipality No. 1 had the power to remove him from office at will. The council of Municipality No. 1 being the appointing power, have the power to remove from office. 6 La. 597, argument. *Labourdette*, if he ever was in office, was removed by the resolution of the council, declaring his election null and void. At all events, the election of *Dupaty* was, in law and in fact, a rightful removal of *Labourdette* from the office of wharfinger. But this subject requires a deeper dissertation.

The municipal corporations of New Orleans, are public corporations, created for political purposes; and are invested with subordinate legislative powers, to be exercised for local purposes connected with the public good. These powers, with the exception of those conferred by the constitution of the State, are subject to the control of the legislature of the State. C. C. arts. 420, 422. 2 Kent's, Comm. 275. In *Edgerton* v. *Municipality No. 3*, this court said : "Constitutions are but the frames of social organisation; they define the objects of government, and establish the great powers which the people intend to be permanent. But the establishment of the subordinate powers, &c., is left to the wisdom and discretion of the legislative department." 1 An. R. 435. After referring to the institutions which provide for the police of towns, neighborhoods, and for the local government of towns, as instances of the exercise of these subordinate powers by the legislature, the court continues : "But it is a remarkable fact, and one that belongs to the cause, that the people of Louisiana, in convention assembled, have twice considered the local government of this great metropolis as too important to be placed among those subordinate institutions, and have recognised the city of New Orleans in its corporate capacity, as entitled to peculiar political powers and privileges ; the political franchises granted to it by the constitution stand upon the same ground as any other constitutional powers; and the city of New Orleans and its officers are, for purposes of police and good order, permanent functionaries of government. The constitutional powers of the government are all trusts. It has been argued that the Municipality No. 3 is not a civil or political corporation under the definition given by the Civil Code. We have already shown that the constitution vests them with that character. The definition relied on from the english side of one of the articles of the Code, proves nothing but the ignorance of the person who translated it from the french. The city of New Orleans is a public corporation, clothed by the constitution (and laws) with important powers of government."

Government is an agency for the benefit of the people. Offices are created, not for the advantage of those who hold them, but for the public good. Officers are agents, mandataries, and trustees, for the people. The office of wharfinger, now under consideration, forms no exception to this principle. In Bacon's Abridgment, *verbo* Offices A, it is said that, "the word *officium* principally implies a duty, and in the next place the charge of such duty ; and that it is a rule that, where one man has to do with another's affairs against his will and without his leave, that this is an office and he is an officer." In 2 Brockenbrough's Rep. 102, Chief Justice *Marshall* said : "An office is defined to be a public charge or employment, and he who performs the duties of the office is an officer. Although an office is an employment, it does not follow that every employment

is an office. But where a duty is a continuing one, defined by rules prescribed by the government and not by contract, and an individual is appointed by government to perform that duty, which continues, though the person be changed, the charge is an office, and the person who performs the duty is an officer."

By the act of 25th of March, 1813, police juries were granted "full power and authority to appoint the constables and other officers necessary to carry into execution the city regulations, and to remove them from office." Sections 1 and 7. We have seen that by the act of 1836, the councils of the several municipalities have an exclusive right to appoint all officers thereof. The power to appoint necessarily implies the power to remove, where there is no express provision to the contrary. Officers appointed for an unlimited period, are removed by a new choice made by the appointing power. The removal takes place by mere operation of law. 13 Peters, 402. 5 Rob. 402. 3 Story's Com. on Const. 338. The power to appoint to offices created by the municipal councils, is vested in them absolutely. The legislature has affixed no term of duration to those offices. In other words, the legislature has made the tenure of those offices a tenure at the will of the council, who are authorised to create and suppress such offices, and to appoint and remove the officers at pleasure. The council has no power to change the tenure. A corporation is a mere creature of the law. It has no powers except those conferred upon it by its charter. It must exist and act in the mode ordained by its creator. It can neither rightfully enlarge nor restrict its duties or its powers, but must continue such as the law constituted it. The unlimited power to appoint to certain offices, and to remove therefrom, was conferred upon the council for the public good. The interests of the community are concerned in preserving this power undiminished. It may be necessary to remove an officer for neglect, or incompetency, without waiting the tedious process of law. It may be sometimes necessary to remove an officer for causes, which, if susceptible of proof at all, can only be proved with great difficulty. It may be necessary to suppress an office. It may be necessary to amalgamate two offices into one. The office of wharfinger, for instance, whose duties are to superintend the police of the wharves, and to regulate the order of mooring vessels, &c., may, perhaps, be beneficially amalgamated with the office of wharfmaster, whose duty it is to collect wharfage dues, &c. Will it be seriously argued that the council can, by fixing a particular tenure to each of these offices, deprive itself of the power to amalgamate them for the public good? That the council can, by these means, diminish its power of accomplishing the ends for which it was created? That it can thus emasculate itself? We contend that, as the corporation cannot extend, so it cannot deprive itself of, the powers confided to it for the benefit of the community.

The power, then, to appoint to office, and thereby to remove at will, conferred upon the council by the charter of the city, cannot be abandoned or surrendered, or bartered away, or in any manner impaired by the council. It must be exercised according to the charter, the organic law, the very constitution of the corporation. The President of the United States having been entrusted with certain powers of appointment, has been held to possess the power of removal; and a question has arisen whether Congress can give any duration of office in such cases, not subject to the exercise of this power of removal. It was held, that the power of removal could not be abridged by legislative action ; at least where the power to appoint cannot be delegated by the legislature. 3 Story's Com. on Const. 390. It seems to be clear and beyond doubt that the municipal council cannot alter the tenure of office created by the legislature of the State, and cannot surrender or impair its power to remove at will.

Nor is the council of Municipality No. 1 justly chargable with any violation of law in this respect, when its acts are fairly and legally interpreted. It is true, the second section of the ordinance creating the office of wharfinger, approved the 11th November, 1834, says, "the term of duration of said office shall expire on the fourth saturday in May next, a period at which said officer shall be annually elected." City Law, 1836, p. 247. But this did not make it an office for the year certain ; it only created it an office for the year, unless the corporation should determine their pleasure within that time.

In the case of the *Corporation of Bedford Level*, already cited, 6 East's Rep. 356, it appeared that the corporation was empowered to appoint and remove officers at will ; that it had accordingly elected its officers annually, and, among others, a register annually for thirty-seven years; that the minute of the last

election stood thus entered on its books: "The corporation then proceeded to the election of officers for the year ensuing," and then followed the list of names of officers. *Lord Erskine* said, *arguendo :* "This is not to be considered as an appointment for a year certain, for the members of the corporation are to be elected annually; yet, the officers appointed by them are removable at pleasure, and therefore the appointment may be determined at any time." *Lord Ellenborough*, C. J., said : "It must be considered as an office for a year, according to the terms of the appointment, unless the corporation should determine their pleasure within that time. That would be the legal effect of the appointment, controlled by the act of parliament."

It may be argued, that the power to remove from office is vested in the council, on the complaint of the mayor, in the manner prescribed by the act of 1836, sec. 8, viz.: "The mayor may, by lodging a complaint before any section council, remove forthwith any officer of one municipality ; provided, that in case said officer should be re-elected by said council, then the mayor shall have no right to remove the same officer during the term of service for which said officer shall have been re-elected" (Bul and Cur. p. 124); and by the first section of the act of March, 14, 1839, amending the act of 1836, which provides that any treasurer or comptroller who shall refuse to furnish the mayor with any statements concerning the finances of either of the municipalities, may be removed from office, and shall not be re-appointed, except upon the recommendation of the mayor, or by four-fifths of the members composing the council (Bul. and Cur. p. 130); and that, therefore, the council alone has no power to remove. We answer, the mode prescribed by the acts of 1836 and 1839, is an additional mode of removal. It does not destroy, nor in any way affect, the right of the council to remove at will.

It is possible that an officer who may not incur the displeasure of the mayor may be guilty of conduct that ought to forfeit his place. His bad actions may be connived at, or be overlooked, by the mayor. So that the power to remove on the complaint of the mayor, is a supplemental security to the people against the continuance of improper persons in office. But it is not the only mode of removal. Under the power to appoint to office conferred upon the council, an incumbent may be superseded at any time by a new appointment made by the council. This plain and obvious construction is supported by authorities in analagous cases. The constitution of the United States provides that, "all civil officers of the United States shall be removed from office on impeachment for, and conviction of, treason, bribery, or other high crimes and misdemeanors." It was contended in the Congress of 1789, that this was a particular mode prescribed for removing, and that, inasmuch as there was no other mode directed, the constitution contemplated only this mode. But it was the opinion of a large majority, that the declaration in the constitution was intended as a supplemental security for the good behaviour of the public officers, and that there was another mode of removal. Lloyd's Deb. 352, 451.

In the case of the Portwardens of New Orleans, *Nicholson et al.* v. *Thompson et al.*, it was contended that the constitution of Louisiana had prescribed the mode by which certain public officers should be removable, in art. 6, sec. 8, (Const. of 1812), and that there was no other mode of removing them. But it was decided that there was another mode of removal, and that these officers might be removed by appointing others in their places. 5 Rob. 367.

III. But suppose the council had a right to surrender its power of removal at will, and thus to annul the tenure of office created by the act of the legislature, and to substitute a tenure of its own ; and suppose the council of 1834 intended to exercise, and did exercise, this right, in passing the ordinance of the 11th of November, 1834, the question still remains, was the council of 1846 bound by this ordinance ?

On the 20th of August, 1838, the council of Municipality No. 1 adopted an ordinance in relation to the officers of the municipality. The second section of that ordinance is in the following words : "The council of the First Municipality reserves the right of amending, when they shall think it necessary, all ordinances fixing the salaries of the officers of this municipality ; and no officer shall have the right of claiming any salary after the date of his removal from office, or suppression of his office, notwithstanding all ordinances contrary to the present." First Municipality Laws, p. 122, sec. 372. It is evident that this ordinance of 1838, resumed for the council, and re-asserted, its power to remove its officers at will ; and that if there is any thing in the ordinance of 1834 conflict-

ing with this, it is repealed. *Leges posteriores priores contrarias abrogant.* It cannot, for a moment, be pretended that, the council of 1834 could abridge the powers of the council of 1838.

IV. The judge *a quo* says, that he has examined closely the effect of the ordinance of 1838 on the present suit, and that the 2d section as understood by defendants would be a derogation to article 2720 of the C. C., which, he argues, is the law of this case. And petitioner's counsel, declaring that they rely on the well settled jurisprudence of the State, refer to the same article of the Civil Code, and to the decisions thereon in 8 La, 183; 12 La. 67; and 15 La. 360.

Article 2720 of the Civil Code is as follows: " If, without any serious ground of complaint, a man should send away a laborer whose services he has hired for a certain time, before that time has expired, he shall be bound to pay to such laborer the whole of the salaries which he would have been entitled to receive, had the full term of his services arrived." The decisions referred to simply show, that the late Supreme Court of this State considered the case of a lawyer employed by a private corporation by the year, and the case of a superintendent and engineer of a cotton press, hired for a certain time, as falling within the equity and spirit of this article, and analagous to the case therein provided for. But we are at a loss to conjecture by what process of reasoning the learned judge, and the able counsel of the petitioner, can come to the conclusion that the article of the Civil Code, and the decisions quoted by them, are applicable to the present case; a case in which the council, by an express and public ordinance, reserved to themselves the right of determining at will the office to which plaintiff was elected, of suppressing the same, or of removing from office any incumbent thereof, without rendering themselves liable for any salary after the date of such removal.

But there is another view of this matter to which the attention of the court is respectfully invited. Among the excellencies of our Civil Code, its order, its lucid method, has been deemed worthy of high commendation. Article 2720 will be found under the title of Letting and Hiring, which is subdivided into two species: 1st, the letting out of things; and 2d, the letting out of labor and industry. C. C. 2643.

Now, labor may be let out in three ways. 1st. Laborers may hire their services to other persons. 2d. Carriers and watermen may hire out their services. And 3d. Workmen may hire out their labor to make buildings or other works. Article 2720 falls under the head of the hiring of servants and workmen, and is intended to apply to workmen employed in manufactures or on plantations, as is evident from the preceding article, 2719, and from the language in the french text of article 2720. It is unnecessary to express any opinion as to the correctness of the supposed analogy between the case provided for in that article, and the cases decided by the late Supreme Court. But the political character of the municipal corporation, the nature and duties of its public officers, and the general policy of the law and government, which have already been developed, show conclusively that the plaintiff has no right of action against the defendants in this case, and that article 2720 is wholly inapplicable. When the plaintiff accepted office, he accepted it on the express condition that he should not have the right of claiming any salary after the date of his removal from office. If a corporate officer is disturbed in his office, or is improperly ousted by an usurper, or is shut out from his office, the law gives him a remedy by *quo warranto*, by *mandamus*, or by an action to recover his fees and salaries from any one who improperly receives them. But this is only in case he has a clear legal right to office. The idea that he can recover a salary from the public when he performs no duty, and that when he is legally removed by the due exercise of the appointing power, in substituting a successor, he is entitled to a continuation of his salary, appears to be little short of an absurdity.

The amount involved in this case is comparatively of little importance, but the principles upon which it depends are of high public concern. They comprise questions concerning the due and proper mode of electing public officers, the power of the municipality over its officers, and the right of removal, with all which the public welfare is intimately blended.

We trust that we have shown that the election of *Labourdette*, on the 11th of May, 1846, was irregular and void. That this irregularity was not cured by the acceptance of his official bond, on the 4th of June. That the election of *Dupaty*, on the 15th of June, was a rightful exercise of power by the council. That the council of the Municipality No. 1, being the appointing power, have

the power to remove from office. That this power of removal is essential to the public welfare, and cannot be impaired or surrendered by the council. That the ordinance of 1834, on which the plaintiff relies, did not create the office of wharfinger an office for a year certain, but left it determinable at the will of the council. That the ordinance of 1834, even if it did create the office for a year certain, was repealed by the ordinance of August 20th, 1838, by which the council expressly resumed to itself the right of removing any of its officers, and stipulated that no officer should have any right of claiming salary after the date of his removal from office. And finally, that article 2720 of the Civil Code, in relation to laborers hired for a definite period of time. is inapplicable to public officers, holding office at the will of the government, whether municipal, state, or national.

LABOURDETTE<br>v.<br>FIRST<br>MUNICIPALITY.

*Morel*, on the same side.

The judgment of the court was pronounced by

EUSTIS, C. J. This case is presented with great ability in the argument of the counsel for the defendants; and concurring with him in the view which he has taken of the illegality of the election of the plaintiff as wharfinger of the Municipality, we think the judge of the District Court erred in deciding against the defendants.

It is unnecessary to decide on the question, concerning the authority of the municipal appointing power to remove from office.

Any claim which the plaintiff may have against the defendants for services rendered, is to be considered as reserved.

It is therefore ordered that the judgment appealed from be reversed, and judgment is rendered for the defendants, with costs in both courts.